**Amy Marie GIANVITO, Appellant**

v.

**Richard GIANVITO, Appellee.**

Superior Court of Pennsylvania.

Argued April 23, 2009.

Filed June 4, 2009.

Terri J. Mitko, Beaver and Staphanie M. Muick–Cervone, Pittsburgh, for appellee.

BEFORE: BOWES, DONOHUE, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Amy Marie Gianvito (Mother) appeals the order entered on June 10, 2008, in the Court of Common Pleas of Beaver County, that granted the custody modification petition filed by Richard Gianvito (Father), which vested in Father primary physical custody of Elizabeth Ann Gianvito (Child), the parties' minor daughter. On appeal, Mother asserts that Father failed to prove that Child's best interests would be served by shifting primary physical custody to Father. Upon review, we affirm.

¶ 2 The relevant facts of this case were set forth fully by the trial court in its Pa.R.A.P. 1925(a) opinion, filed October 22, 2008, as follows:

Initially, [Father] and [Mother] met at Western Beaver School District in Beaver County, Pennsylvania. The parties were high school sweethearts. During the beginning of their relationship, [Mother] became an integral part of the extended Gianvito family. After graduating from high school, [Father and Mother] became engaged and lived at the residence of Richard A. and Eleanor Gianvito, paternal grandparents. The parties married on September 12, 1998[,] and bought a house in Chippewa in Beaver County. After two years the parties bought their marital home from the paternal grandparents located in Ohioville, Beaver County. During the beginning of their marriage, [Mother] worked and also went to school. Father worked as a plant worker at S.H. Bell, a local company in Midland, PA. At trial, paternal grandfather testified that they developed a close relationship with [Mother] and adopted her into the Gianvito family.

On February 5, 2002, [Child] was born during the marriage of the parties. During the first 2½ years of [Child's] life, [Mother] did not work but was a [stay-at-home] mother. Father and paternal grandparents were actively involved in rearing [Child] during [her] infancy. During this time, [Father] shared in the day to day care of [Child]. Father was a hands[-]on dad who cared daily for [Child]. Father changed diapers, bathed [Child], fed [her], and took her for medical and dental appointments. In addition, paternal grandparents were both actively involved in caring for [Child] during her infancy. At trial, no evidence was presented that established any kind of involvement of [Mother's] family with [Child] during her infancy.

In June of 2004, [Mother] went back to work full-time and returned to school to obtain a degree. At this time, [Father] had lost his job at S.H. Bell. From June 2004 to the parties' final separation of April 2006, [Father] became ["Mr. Mom"] and was the primary caretaker for [Child] during the daytime. At trial, [Father] stated how he cared for the physical needs of [Child] and developed a close relationship with her. Father explained to the [trial court] how he established a daily routine for the care of [Child] and did everything with her. The Gianvito family had a strong commitment to take care of their family members in times of need. Paternal grandparents provided needed child care for [Child] when [Mother] was working and in school at night and when [Father] worked part-time as a police officer two days a week during the midnight shift. During this time period,

[Child] developed a strong bond with paternal grandparents, who she referred to as "Pap-pap" and "Gigi." Based on the efforts of [Father] and paternal grandparents, no outside child care was needed for the care of Child.

In February 2004, [Mother] and [Father] separated for 3–4 months and finally separated in April 2006. From April 2006 to January 2007, [Mother] continued to live with Child at the parties' marital home in Ohioville. During this time of separation, [Father] lived with the paternal grandparents at their residence. At trial [Father] testified that he provided care for Child at his parents home during daylight hours prior to going to work [at] midnight as a part-time police officer. Paternal grandparents continued to provide extensive daycare for Child while [Mother] worked full-time and went to school at night.

In April 2006, the parties were divorced. At trial, [Mother] testified that she did not want to continue to live at the marital home in Ohioville. The marital residence was sold in January 2007. In February 2007, [Mother] moved with Child to 430 Lee Dr., Apt. 96, Moon Twp. in Allegheny County. Mother's new 3–bedroom apartment was located in a college area. Father opposed [Mother's] move to Moon Twp., because the apartment had a college atmosphere, it was located in an area without children, and the move added additional distance causing difficulties for [Father] and paternal grandfather to continue to provide care for Child during the daylight hours.

On January 30, 2007, [Mother] filed a custody complaint requesting physical custody of Child. On March 5, 2007, [Father] filed an Answer and counterclaim requesting shared physical custody of [Child]. On March 16, 2007, the Honorable Judge Deborah Kunselman entered a proposed Order granting shared legal custody to the parents, physical custody of [Child] to [Mother] and partial custody visitation rights of every other weekend and every Tuesday and Thursday from 5:30 p.m. to 8:30 p.m. to [Father]. Under the March 16, 2007 Order, the custody exchanges occurred in Center Twp., Beaver County, and the parties shared transportation responsibility. On April 5, 2007, [Father] filed exceptions to the proposed order of March 16, 2007. In his exceptions, [Father] requested that [he] and paternal grandparents continue to care for [Child] during the daylight hours of the week. In his exceptions, [Father] requested shared custody of [Child]. On June 21, 2007, [Mother] filed a Petition for Special Relief alleging that she had relocated to Moon Twp. to be closer to her work in Moon Twp. and that the roundtrips to Center Twp. to paternal grandparents to provide child care was burdensome upon her. On June 21, 2007, the Honorable Judge Deborah Kunselman amended paragraph II A2 of the proposed order of March 16, 2007, to provide that [Father] shall have partial custody visitation rights with [Child] during the school week every Tuesday and Thursday from 5:30 p.m. to 8:30 p.m. Transportation responsibility was placed on [Father]. On October 16, 2007, [Mother] entered into a custody agreement that was adopted by the Court. This agreement provided for: shared legal custody by the parents, physical custody of the minor to [Mother], and partial custody visitation rights to [Father]. Under this agreement, [Father] had partial custody every other weekend during the school year; alternating Thursdays on weeks following weekend partial custody from after

school to 7:00 p.m.; on alternating weeks that [Father] does not have a weekend from. after school Monday to 7:00 p.m. Tuesday; alternating holidays; and week on/week off during [Child's] summer vacation. At the time of the agreed Order, [Father] was residing at 138 Meadow Drive, Beaver Falls (Chippewa), Beaver County, and [Mother] was residing at 430 Lee Drive, Apt. 96 Moon Twp., Allegheny County.

On March 5, 2008, [Mother] filed a Motion for Special Relief requesting permission from [the trial court] to relocate with [Child] to Greentree City, PA. On March 17, 2008, [Father] filed a petition requesting modification of the agreed Order of October 16, 2007.

Following a consolidated trial on May 27 and 29, 2008, [the trial court] issued an Order on June 16, 2008 awarding physical custody to [Father] and partial custody visitation rights to [Mother] every other weekend from 6:00 p.m. Friday to 6:00 p.m. Sunday, every Tuesday from 5:30 p.m. to 8:30 p.m. alternating holidays; and 3 non-consecutive weeks during the summer months. The responsibility of transportation was to be shared by the parties. The pickup and drop-off point for the parties was in Moon Twp., PA. On July 9, 2008, [Mother] filed a Notice of Appeal to [this Court].

Trial court opinion, 10/22/2008, at 1–5 (citations omitted).

¶ 3 After the trial court received Mother's notice of appeal, it ordered her to file a concise statement of errors complained of on appeal. Mother complied with the trial court's order and filed the concise statement in a timely fashion. Thereafter, the trial court authored an opinion that addressed the issues presented in Mother's concise statement.

¶ 4 Our review of appeals from custody matters is governed by the following principles:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

Collins v. Collins, 897 A.2d 466, 471 (Pa.Super.2006) (citations and quotation marks omitted). Further, a party that seeks to modify an existing custody order must demonstrate a substantial change in circumstances that would justify a trial court's reconsideration of the custody disposition. See Kozlowski v. Kozlowski, 362 Pa.Super. 516, 524 A.2d 995, 997 (1987). Once a substantial change in circumstances has been shown, the trial court must then consider the best interests of the child. Id., 524 A.2d at 997.

¶ 5 We observe that Mother does not dispute the issue of whether the trial court's custody modification order was predicated upon a substantial change in the circumstances of the parties. Accordingly, we shall confine our analysis to the question of whether the trial court's custody modification order was in Child's best interests. Kozlowski, 524 A.2d at 997.

Mother's challenges to the trial court's conclusions regarding Child's best interests stem from essentially two arguments, *i.e.*, that the trial court failed to afford proper weight to Mother's status as Child's primary caretaker and that it failed to give proper weight to Child's preference to maintain the *status quo*. We disagree with Mother's contentions.

¶ 6 The "primary caretaker doctrine" holds that a trial court is to give positive consideration in a custody dispute to the parent who has acted as their child's primary caretaker. *See Klos v. Klos*, 934 A.2d 724, 730 n. 4 (Pa.Super.2007). However, when applying the "primary caretaker doctrine," the trial court must also consider the quality and quantity of care actually given to the child by the parent as opposed to the supervisory care by others while in the parent's custody. *See Wiseman v. Wall*, 718 A.2d 844, 847 (Pa.Super.1998). Further, a parent's ability to care for a child must be determined as of the time of the custody hearing and not as of an earlier time. *Id.*, 718 A.2d at 847. Presently, the facts found by the trial court reflect that Father was involved substantially in Child's life from infancy. Father's conduct since that time indicates that he has placed Child in a position of preeminent importance in his life and that he has willingly borne difficulties to himself arising from that decision. Father has crafted his work schedule to maximize the time he could spend with Child, and he and his fiancé, Nicole Young, have purchased a home so as to be closer to Child at her current residence with Mother in Moon Township. Father undertook this move despite the fact that the move would increase his daily commute to work. Likewise, even after Child had moved with Mother to Moon Township, Father sought to take Child to various dental and medical appointments. Further, while Child was in day care, Father became a parent helper for Child's class. Additionally, Ms. Young enjoys an outstanding relationship with Child, and she treats Child as if she were her daughter.

¶ 7 On the other hand, Mother, while a fit and loving parent, made decisions based upon fulfilling her own personal and professional needs before considering the best means to suit Child's developmental needs. It is correct that Mother was Child's primary caretaker for the first two years of her life, and the trial court's previous orders reflected that status. However, after that time, Mother attended college and left the day-to-day responsibility of raising Child to Father and paternal grandparents. After the parties' separation, Mother moved to a college community in Moon Township in order to lessen her work commute, although she was able to live in the former marital residence. Her relocation has also made custody transfers more difficult for Father. Further, Mother elected to place Child in day care for extended periods of time rather than to permit paternal grandparents to watch Child daily, without charge.[1] Mother now expresses a desire to move to Greentree City, Allegheny County, in order to live with Paul Jenkins, her fiancé, who is unwilling to live outside of the Pittsburgh area and is unable to relocate due to his employment as a police officer and its concomitant residency requirement. Mr. Jenkins has a friendly relationship with Child, but Child has not bonded to Mr. Jenkins in the same fashion as she has with Ms. Young.

---

1. Parental grandparents have reaffirmed their commitment to care for Child whenever the need arises.

¶ 8 Our review of the trial court's weighing of the parental contributions made by Father and Mother indicates that the trial court did not abuse its discretion with regard to its application of the "primary caretaker doctrine." Importantly, *at the time of the custody trial,* the quality of time spent by Father with Child and his impressive shouldering of parental responsibility befitted the trial court's recognition that, in fact, Father was Child's primary caretaker. *See Wiseman,* 718 A.2d at 847. It is evident that the trial court did not reach this conclusion to diminish Mother's contributions to Child's life, as it is clear that Mother is a loving and fit parent. However, Father's willingness to prioritize Child's needs at all points and the positive benefits that Child will receive in his custody, *i.e.,* maximization of direct parent-child care, closeness to and daily care from family members, and greater stability, indicate that the trial court did not err in its application of the "primary caretaker doctrine." *Id.,* 718 A.2d at 847. Accordingly, Mother's argument fails.

■■ ¶ 9 Mother contends next that the trial court failed to place adequate weight on Child's preference to maintain the *status quo* between the parties. The Pennsylvania Domestic Relations Code, 23 Pa.C.S.A. § 101, *et seq.,* is clear that a trial court is required to consider a child's preference before entering an award of partial custody, as well as any other factor which will legitimately impact the child's physical, intellectual, and emotional well being. *See* 23 Pa.C.S.A. § 5303(a)(1). The weight to be afforded to the child's preference varies with the age, maturity, and intelligence of that child, together with the reasons given for the preference. *Wheeler v. Mazur,* 793 A.2d 929, 938 (Pa.Super.2002).

¶ 10 The trial court found that Child was a bright, well-mannered six-year old child. During the trial court's *in camera* inter-view with Child, she expressed a desire to live with Mother and Father on an alternating weekly basis. The trial court found that Child's responses bespoke her inability to understand the nature of the proceedings and her inability to choose between Mother and Father as her primary caretaker. Mother, on the other hand, contends that Child's statement expressed her desire to maintain the *status quo* between the parties.

¶ 11 It is correct, as Mother asserts, that Child spent a significant amount of time with both parties under the prior custody order. Yet, we do not, as Mother would have us, interpret this fact in concert with Child's responses to the trial court as evidence of her desire to maintain the *status quo* between the parties. First, Child's statements were not emphatic or adamant in favor of one parent over the other; her statements indicated nothing less than the fact that she loves both parties and is happy living with either of them. Nevertheless, even if we were to give Child's statements Mother's preferred interpretation, the trial court's findings indicate that Child was a young child, and, although intelligent for her age, she was unable to fully understand the nature of the proceedings and the effect that they would have upon her in the future. Therefore, it did not place great weight to Child's preference. We agree with the trial court's conclusion.

¶ 12 To explicate, the record reflects that the parties' work schedules and the distance between their residences make an alternating weekly custody schedule not feasible to maintain on a year-long basis. Child was clearly unaware of this fact when she responded to the trial court's questioning, and, due to her close relationships with both Father and Mother, it is unlikely that this knowledge would have changed her mind. Moreover, regardless

of her preferences to the contrary, Child's *status quo* would undoubtedly change in any event due to the upcoming marriages and relocations of the parties. Consequently, we are not disturbed by the trial court's decision not to place a great deal of weight on Child's preferences regarding who would be her primary physical custodian. *See, e.g., Wheeler,* 793 A.2d at 938 (weight to child's preference is given according to child's age and maturity). Accordingly, Mother's argument fails.

¶ 13 As Mother's arguments fail, we affirm the order of the trial court.

¶ 14 Order affirmed.