J-A27035-18

2019 PA Super 126

| T.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| H.M. | : | |
| | : | |
| Appellant | : | No. 1081 EDA 2018 |

Appeal from the Order Entered March 15, 2018
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2015-FC-462

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

DISSENTING OPINION BY BOWES, J.:                **FILED APRIL 24, 2019**

I believe the trial court abused its discretion by refusing to order a comprehensive custody evaluation as recommended by the court-appointed expert, Ronald J. Esteve, Ph.D.  Accordingly, I respectfully dissent from the learned majority's decision to affirm the order awarding T.M. ("Mother") primary physical custody of the minor child, J.M., who was born of Mother's marriage to H.M. ("Father").

Pursuant to Pa.R.C.P. 1915.8(a), a custody court "may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts."[1]  Whether to order a custody evaluation

---

[1] Pa.R.C.P. 1915.8(a) provides as follows:

**Rule 1915.8.  Physical and Mental Examination of Persons**

is a matter within the purview of the custody court. ***Jordan v. Jackson***, 876 A.2d 443, 455 (Pa. Super. 2005) ("It is clearly within the court's discretion whether to order an evaluation."). An abuse of discretion occurs where a trial court "overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record[.]" ***Ottolini v. Barrett***, 954 A.2d 610, 612 (Pa.Super. 2008).

The majority provides three bases to affirm the court's decision to discount Dr. Esteves's recommendation and forego ordering a complete child custody evaluation: (1) custody evaluations are not mandatory; (2) this case is distinguishable from precedent where we concluded that an evaluation was warranted; and (3) "a full custody evaluation might result in increasing the already rampant animosity between the parties." Majority Opinion at 9. As I explain in detail *infra*, none of these grounds defeats Father's claim that the court abused its discretion in ignoring the obvious need for a comprehensive custody evaluation and by rejecting his several entreaties for the court to order it.

---

(a) The court may order the child or a party to submit to an evaluation by an appropriate expert or experts. The order may be made upon the courts own motion or on motion of a party with reasonable notice to the person to be examined, and shall specify the place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.

I frame my perspective of the majority's position with three countervailing points, which I outline at the outset and develop seriatim *infra*. First, while custody evaluations are not mandatory, they are invaluable, and it is beyond peradventure that it serves a child's best interests to perform a comprehensive review of all of the relevant circumstances prior to rendering a custody decision. Next, notwithstanding the majority's protestations to the contrary, this appeal aligns with the facts of **Johns v. Cioci**, 865 A.2d 931 (Pa.Super. 2004), wherein we vacated a custody order and remanded the case with directions for the trial court to order a full custody evaluation. Finally, to the extent that the trial court invoked the parental conflict as a reason to forego the custody evaluation, the record bears out that the enmity between Mother and Father is so severe that it will continue to permeate these proceedings regardless of the court's protective measure. Stated plainly, the animosity between Mother and Father could not help but filter down to J.M. In my view, attempting to shield J.M. from the all-consuming discord between Mother and Father is futile. It is clear that J.M.'s interests would be better served if the court confronted the obstructive parental conflict, utilized a comprehensive custody evaluation to expose the source of the dissonance, and eradicated it.

Although Rule 1915.8(a) does not mandate a custody evaluation in every case, the rule's explanatory comment recognizes that custody evaluations are among the class of evidence that "have served as a means to provide the court with a full and complete record[.]" Pa.R.C.P. 1915.8

Explanatory Cmt.—2007. The polestar of child custody law is to serve the best interests of the child. **C.G. v. J.H.**, 193 A.3d 891, 909 (Pa. 2018) ("The paramount concern in child custody cases is the best interests of the child."). The esteemed Joanne Ross Wilder articulated the importance of a comprehensive review in this situation as follows, "Custody determinations are so important that the trial court is expected to play an active role in creating a thorough and complete record." Wilder, Pa. Family Law Prac. and Proc. (5th ed.), § 28-5 (footnote omitted). Indeed, "[o]f all cases presented to the courts, none is considered more important than the determination of the custody of children." **Ashford v. Ashford**, 576 A.2d 1076, 1079 (Pa.Super. 1990). Thus, custody hearings must be "full and comprehensive and all witnesses be heard who can contribute to that understanding[.]" **Id**. at 1080. In this vein, I highlight Attorney Wilder's valued sentiments, "the purpose of a psychological evaluation in a custody case is to assess the best psychological interest of the child, focusing upon parenting capacity, the psychological and developmental needs of the child, and the resulting fit." Wilder, **supra** at § 28-5 (footnote omitted). Stated another way, a custody evaluation exposes truths that are essential to the creation of a full and complete record. Accordingly, while the majority's statement of law is accurate insofar as a custody evaluation is not mandatory under Rule 1915.8(a), the fact that the evaluation was not compulsory does not negate the reality that it was necessary for the court to be fully informed on the nuanced aspects of this case.

We addressed a similar situation in **Johns**, **supra**, and after finding that the certified record did not support the court's award of primary physical custody to Father, this Court vacated the award and remanded the case for a comprehensive custody evaluation prior to the new custody hearing. **Johns** involved a custody dispute concerning a twelve-year-old child of divorced parents whose "relationship has been characterized by poor communication, frequent disagreements, and numerous court appearances." **Id**. at 934. As part of the ongoing, contentious litigation, the father requested a custody evaluation, but the trial court ruled that a thorough custody evaluation was unnecessary. Instead, the court-appointed expert performed a limited psychological evaluation on the mother and father. Although the trial court communicated with the expert, neither party presented the expert to testify during the ensuing custody hearing. The custody court awarded the father primary custody, and the mother appealed. **Id**. at 935.

On appeal, this Court remanded the matter and directed the parties to undergo a comprehensive custody evaluation. In ordering the evaluation, we stated:

> Both parties love their daughter, have the ability and desire to provide for her well-being, and give high priority to her welfare. While we recognize that the child has flourished with Mother as primary caretaker, we are nonetheless concerned about the many examples of Mother's manipulative behavior and her failure to encourage the loving relationship that the child has with Father.

**Id**. at 945.

As explained, below, I believe that the **Johns** Court's rationale compels that we remand this appeal for a thorough custody evaluation. I begin with a brief primer on this close case between combative parents with an enduring mistrust of one another. Neither parent's behavior is beyond reproach, and the certified record is replete with examples of their pugnacity. Mother is adverse to any form of cooperative parenting, and complains that Father is innately chauvinistic due to his foreign culture, unable to provide adequate care or supervision, and litigious, having initiated the current custody modification proceeding months after the trial court entered a final custody order. Father counters that Mother intentionally interferes with his relationship with J.M. and purposely distracted J.M. during his interactions with Father on the telephone, Skype, and FaceTime. Meanwhile, eight-year old J.M. is suffering from the discord. Indeed, based upon his limited psychological evaluation of J.M., Dr. Esteve determined that, while J.M. appears healthy, the child has shouldered a degree of responsibility for the parental dissonance and assumed some responsibility for correcting it.

Father initiated the latest chapter of the custody dispute in December 2016, when he filed a petition to modify the existing custody order. Father argued that the court-ordered custody arrangement allotting him biweekly physical custody between Wednesday afternoon and Sunday evening created a ten-day lapse in any physical contact with his son. Furthermore, he complained that Mother refused to facilitate the court-ordered telephone contact with J.M. during his noncustodial periods. Father requested that the

trial court order specific dates and times for his telephone contact, or alternatively, permit dinner visits during the noncustodial week. Mother responded with a petition for modification that sought to further reduce Father's biweekly period of overnight custody from the five days (Wednesday-Sunday) to two (Friday-Sunday).

Following a custody conference, the trial court entered an interim order directing the parties to consult with J.M.'s therapist, Deb Stoner, to address J.M.'s apparent reluctance to speak with Father on the telephone while the child was in Mother's physical custody. Specifically, the order read, "Ms. Stoner is requested to assist the parties in resolving their differences regarding telephone and/or FaceTime/Skype contact between the minor child and Father." Trial Court Opinion, 1/23/17, at 2. However, on March 29, 2017, the custody court entered an interim order that changed J.M.'s counselor from Deb Stoner to Andrea Nation, "the counselor identified by Mother as having insurance coverage," and directed that the counselor address the "telephone/FaceTime/Skype" issue and oversee telephone communication during at least one session per week. Trial Court Opinion, 3/29/17, at 1-3. The interim order allowed Father to verify Ms. Nation's qualifications, confirm insurance coverage, and determine whether he would agree to utilize Ms. Nation's services in lieu of one of the counselors recommended by Ms. Stoner.

Meanwhile, in anticipation of the custody hearing, Father requested a comprehensive custody evaluation. Following argument on Father's petition, the trial court declined Father's request for a custody evaluation but permitted

Father to obtain a psychological evaluation of J.M., which Dr. Esteve completed on January 6, 2018.

During trial, Dr. Esteve testified that he was appointed to perform a psychological evaluation of J.M., which he described as "an assessment of the nature of his relationship with both parents." N.T., 2/12/18, at 48. He presumed that the court's purpose for the evaluation "was to determine if, at all, there is any consequence to the [parental] conflict, and obviously, litigation between these parents on the development of this child." *Id*. at 55. Stated plainly, Dr. Esteve, was "interested in how the child functions" emotionally. *Id*. at 56.

In performing the evaluation, Dr. Esteve interviewed both parents, administered a parenting stress index, which measured the parental perceptions of Mother and Father, and conducted interactional evaluations of J.M. with each parent. Notably, J.M. "is exquisitely aware" of the parental conflict, which neither parent has taken responsibility for escalating. *Id*. at 66, 76. Indeed, Dr. Esteve observed that the then-seven-year-old child was the only member of the family that has made any accommodations. *Id*. at 67. He advised the court that where, as here, the enmity between parents is obvious, a significant component of the interactional evaluation is to observe "how comfortable the child is to discuss the other parent and in that parent's presence." *Id*. at 57.

In this vein, Dr. Esteve testified that J.M. was more reserved during his interactional with Mother than his meeting with Father. *Id*. at 59. Specifically, during his interactional with Father, J.M. was extremely sociable, open, affectionate, and freely spoke of Mother. *Id*. at 56-57. Dr. Esteve perceived a loving interaction between Father and J.M., and noted that the two share "a very strong bond." *Id*. at 64. Tellingly, Dr. Estevez testified that his actual observations of Father with J.M. belied Mother's characterization of Father as historically unaffectionate toward their son. *Id*. at 64.

In contrast, J.M. was "substantially different" during the subsequent interactional with Mother. *Id*. at 58. The child initially refused to interact with Dr. Esteve. *Id*. at 59. Thereafter, he was defiant with Mother, snubbed her attempts to redirect his attention to the card game that they had started, and engaged in negative attention seeking-behavior. *Id*. at 59-60. In addition, unlike the openness he displayed toward the absent parent during the interview with Father, J.M. neglected to mention Father in Mother's presence. *Id*. at 60.

As I previously indicated, Mother opposes cooperative parenting. Instead, she endorses parallel parenting, an absolutist approach that shuns communication and coordination between parents. Dr. Esteve stated that parallel parenting, where each parent makes decisions for the child independently, is incompatible with the fundamental principle that parental harmony and cooperation are essential to ensuring a child's mental health.

He explained, "the most potentially damaging or traumatic experience for a child is unresolved chronic conflict between his parents." *Id*. at 67. Dr. Esteve continued, "it is profoundly important to know that both . . . parents are communicating with each other[.]" *Id*. at 68. Unfortunately, seemingly blind to the crisis's effect on J.M., Mother believes that any expectation of co-parenting "disrespect[s]" the reality that Mother and Father have a damaged relationship that is beyond repair. *Id*. at 66.

Ultimately, Dr. Esteve rendered three recommendations: (1) counseling to help J.M. understand that he is neither the cause of the parental strife nor responsible for resolving it; (2) parental counseling, despite Mother's overt aversion to participation, to reduce the risk of harm that the conflict poses to J.M.; and (3) a thorough custody evaluation. As it relates to the custody evaluation, Dr. Esteve explained,

> I know that they went through an evaluation already but conducting a full evaluation [is recommended.] And the reason I say that is the possibility . . . that [it] . . . might add more information [for] the Court. I wasn't asking the parents to criticize the other parent. I wasn't asking them for a lot of detail about the other parent nor was I asking them for a lot of detail about themselves.
>
> Hence, I can't make custody recommendations, but they both clearly were highly motivated to tell me what their express concerns are, valid or not, about the other parent. That's what it becomes then. It's about the other parent or their problems in their relationship with the other parent. The only way I can opine about that is to . . . spend the time with both of them and go through the procedures that I would need to go through with both of them. Otherwise, I can't express a direct opinion about that. That's why th[e] recommendation [for a custody evaluation] is there.

*Id*. at 69-70.

In order to provide the court with a meaningful custody recommendation, Dr. Esteve needed to perform a detailed examination of the parental conflict, the nature of the countervailing assertions, and their effect on J.M. This aspect of Dr. Esteve's recommendation echoes the bedrock tenet of breadth of record that Attorney Wilder articulated in her treatise, and that resonated with this Court in ***Ashford, supra***, wherein we remanded a custody appeal for further proceedings "because of the requirement that all custody hearings be full and comprehensive and all witnesses be heard who can contribute to th[e] understanding [of a child's best interest]." ***Ashford, supra*** at 1080, 1081 ("We are not prepared to reverse the Order of the trial court but are not of the opinion that the record is adequate to support the trial court's decision[.]").

As noted *supra*, the court rejected this component of Dr. Esteve's recommendation, awarded Mother primary physical custody of J.M., and effectively reduced Father's custodial period by one day.[2] In explaining its basis for declining to order a comprehensive custody evaluation, the trial court invoked the seven-year-old's desire to maintain the status quo, and the court's

_____

[2] While the prior custody order awarded Father partial physical custody on alternating weeks between Wednesday afternoon and Sunday evening, the current order provides the biweekly custody between Thursday afternoon and Monday morning during the school year. Thus, unless the Monday falls on a day when school is not scheduled **and** the day is not one of Mother's predetermined holidays, Father's time with J.M. is effectively reduced by one day per custodial period.

- 11 -

wish to avoid aggravating the parental conflict. While my learned colleagues adopt the court's positions, I respectfully disagree.

As highlighted by Dr. Esteve's foregoing testimony, the stress associated with the intense hostility between Mother and Father is a threat to J.M.'s emotional well-being. In light of this persistent dissension, which, at Mother's directive, the parents have neglected to resolve through counseling, I believe that the trial court erred in failing to order a comprehensive custody evaluation that would have provided **all** of the information necessary to evaluate the entanglement of issues involved in this case.

Instantly, the custody court conducted a rote application of the custody factors outlined in 23 Pa.C.S. § 5328(a) and fashioned an award in Mother's favor. In rejecting Father's claims on appeal, the majority engages in an equally limited analysis, at least as it relates to Father's complaints regarding the trial court's failure to order a comprehensive custody evaluation.

This Court has stated that, "All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa.Super. 2011) (cleaned up). Instantly, the trial court determined that one-half of the factors, *i.e.*, two, five, six, eight, nine, thirteen, fourteen, and fifteen, were either neutral or inapplicable to the facts of this case. Of the remaining factors, all but two militated "slightly in favor of [Mother]" Trial Court Order, 3/15/18, at 1-5. Specifically, the court found that factors eleven and twelve, relating to the

proximity of the residences and the availability of child care, respectively, weighed in Mother's favor without qualification. *Id*. at 6. From my perspective, in electing to forego a comprehensive custody evaluation, the trial court eschewed the essential resource that would have aided it in considering the statutory factors that the court determined where nearly equal but favored Mother ever so slightly. Without the assistance of a comprehensive custody evaluation, the court was required to employ mechanical decision making, when the facts demanded a contextual examination of the entire case.

One example where a custody evaluation would have been beneficial to the court relates to its review of Father's interactions with Ms. Nation. A significant component of the trial court's custody analysis centers on the fact that Father temporarily stopped taking J.M. to counseling with Ms. Nation between September and November 2017. I start by recalling two important points of reference. First, Father consistently transported J.M. to the counseling sessions between April 2017 and immediately before Ms. Nation's September communiqué advising him of her unilateral decision to terminate the court-ordered focus of the counseling. Second, Father reinitiated J.M.'s treatment with Ms. Nation during December 2017, when it became evident that Mother had weaponized his reaction to the reworked counseling sessions and sought to use it against him during the custody proceedings. Mother's maneuver proved fruitful, and Father's interactions with Ms. Nation during this

period framed the trial court's custody determination to the degree that it referenced Father's behavior throughout its order and opinion and invoked it specifically in analyzing two of the factors that militated in Mother's favor.

However, I believe that a review of this situation through the prism of a comprehensive custody evaluation would demonstrate that the court's overt disapproval of Father's conduct is misplaced. In point of fact, Father's motives were valid insofar as the presumably neutral counselor, Ms. Nation, was hesitant to meet Father in person and she unilaterally decided to ignore the court-ordered focus of the counseling sessions, *i.e.*, J.M.'s reluctance to engage Father on the telephone while in Mother's custody. Moreover, the record bears out that Father maintained contact with the counselor during the three-month hiatus, and most importantly, that Ms. Nation did not view Father's lull as problematic.

A comprehensive custody evaluation would have flushed out the fact that this seemingly hotly-contested issue between Mother and Father that contributed the court's custody analysis was, in reality, trivial in its relation to J.M.'s best interest. However, without the assistance of the custody evaluation, the trial court neglected the foregoing circumstances and considered Father's hesitation to continue with the then-unsanctioned focus of counseling as evidence that Mother not only was the parent more likely to encourage contact with the other party, but also was the person who performed the parental duties.

Furthermore, notwithstanding the majority's protestations to the contrary, the case at bar is strikingly similar to the facts underlying *Johns*. There is an extended history of litigation, Father's concerns about Mother's interference with his telephone contact with J.M. have persisted throughout the custody dispute, and although Father twice requested a comprehensive custody evaluation to address this component of the case, the trial court only permitted Dr. Esteve to perform a psychological evaluation of the child. When Father renewed his request for a comprehensive evaluation, the court deferred its ruling until further testimony was received at trial, and subsequently denied the entreaty outright.

Both *Johns* and the case at bar involve unduly combative parents whose intense hostility placed their child at risk. While the twelve-year old child in *Johns* vented her emotions overtly, and J.M.'s expressions are internal, in both instances, the trial court recognized the need for counseling to assist the children in dealing with the mutual enmity between their respective parents. Moreover, while the majority attempts to distinguish the *Johns* decision based upon the fact that the mother had filed a petition to relocate, that fact was irrelevant to our determination concerning the need for a thorough custody evaluation. Indeed, this Court specifically affirmed the custody court order that denied the mother's petition for relocation. *See Johns*, *supra* at 939 ("In light of all of the above factors, we affirm the trial court's conclusion that Mother did not meet her burden of proof with regard to the first prong of [the

relocation considerations].").  Nevertheless, in reaching the separate issue concerning the effect of an award of primary physical custody on a child who is at risk emotionally, the issue which aligns precisely with the case at bar, we reasoned "the trial judge found the problems sufficiently severe to agree that immediate counseling for the child was needed.  Given the instability that this child has experienced and her apparently difficult adjustment, we believe a full custody evaluation is necessary."  *Id*. at 945.  In light of our express concern with the child's stability and difficulty adjusting, issues that reverberate in this case with J.M., I am not persuaded by the majority's attempt to fashion a ground to avoid the application of the *Johns* Court's rationale herein.

Similarly, the trial court's preoccupation with potentially increasing the animosity is misplaced.  I recognize that J.M. noted a desire to maintain the *status quo* and informed the court that he did not want to talk to Father on the telephone while in Mother's physical custody.  While the trial court, and by extension the majority, accept the child's statements at face value, I believe that a thorough custody evaluation is necessary to penetrate the child's response and reveal his true motivations.  Mindful of Father's assertion that Mother commonly interferes with the father-son relationship, it is possible, if not probable, that J.M.'s reluctance to speak with Father in this circumstance is a product of Mother's control rather than J.M.'s independent aversion to increased contact.  Indeed, even in rejecting a comprehensive

custody evaluation, the trial court recognized, "something deeper is going on with the child that he did not want to spend more time with his father and did not want to call him during his mother's custody periods." Trial Court Opinion, 6/29/18, at 11. However, instead of confronting this situation directly and permitting Dr. Esteve to perform a custody evaluation to investigate the "deeper" issue that the court clearly identified, the court simply rejected Father's assertions of parental interference and relied upon the child's stated preference as a basis to decline further inquiry. *Id*. at 11-12. In my view, this was reversible error.[3]

Finally, the trial court cites the parental discord as a basis to maintain the status quo and forego the custody evaluation. However, attempting to shield J.M. from parental conflict by limiting his physical and telephone contact with Father is a defective prophylactic because it not only impedes the development of the beneficial bond between J.M., but also rewards Mother for her obstinate refusal to engage in counseling and does an end run around the

---

[3] Ironically, while the trial court noted that J.M. would have to "address certain issues related to his father in therapy," the court not only endorsed Mother's selection of Ms. Nation, a therapist who expressly refused to address this **precise** issue, but it also criticized Father for challenging Ms. Nation's decision to circumvent the court-ordered focus of therapy and then faulted Father for protesting that decision, as if Father's post-hoc protest was the reason that Ms. Nation altered the therapy in the first place. Trial Court Opinion, 6/29/18, at 11-12; **see also** Trial Court Order, 4/15/18, at 2 ("[J.M.'s] adamant refusal to speak to [Father] over the telephone . . . was to be the subject of counseling with Andrea Nation, LCSW, but [Father] stopped taking the child for approximately four months."). The temporal fallacy of the court's rational is obvious.

fundamental issue in the custody dispute, *i.e.*, how the conflict inhibits the child's best interest. Unlike the trial court, and by extension the majority, I believe that the court's hesitation to confront the essential issue because it is unpleasant resulted in a disservice to the child. Rather than simply yielding to the animosity raging between the parents as an encumbrance to achieving J.M.'s best interest, the court could, but consistently declines to, order the parties to engage in parental counseling, a remedy that Mother continues to oppose.

Thus, despite acknowledging the benefits of a comprehensive custody evaluation, the trial court declined to order it. As the court did not have the necessary information to evaluate all of the issues in this case, I believe the court abused its discretion in refusing to order the recommended custody evaluation. Accordingly, I would vacate the trial court's March 15, 2018 custody order awarding Mother primary physical custody, and consistent with ***Johns***, ***supra***, remand this matter to the trial court for the preparation of a comprehensive custody evaluation that comports with Dr. Esteve's recommendation.