J-A03034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| WILLIAM E. HUTCHESON, III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| NICOLE A. SUISSA | : | |
| | : | |
| Appellant | : | No. 2368 EDA 2022 |

Appeal from the Order Entered August 12, 2022
In the Court of Common Pleas of Northampton County
Civil Division at No(s): C-48-CV-2020-2557

BEFORE:   KING, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                              **FILED JUNE 13, 2023**

Appellant, Nicole A. Suissa ("Mother"), appeals from the order entered in the Northampton County Court of Common Pleas, which awarded Appellee, William E. Hutcheson, III ("Father") primary physical custody and shared legal custody of the parties' minor child, S.H. ("Child"). We affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father met in 2013 when Father was working in Carlisle, Pennsylvania and Mother was attending Penn State Law School. They began dating in 2014 and Mother became pregnant with Child while she was in her third year of law school. Mother graduated law school in May 2015 and moved in with Father in June 2015. Shortly thereafter, Child was born in July 2015.

_____

[*] Former Justice specially assigned to the Superior Court.

Both parents lived together and cared for Child until Mother got a job in Albany, New York in March 2016. Mother and Child moved to Albany while Father remained in Carlisle until May 2016, when he moved to North Carolina to begin law school.

During this period, the parties were not romantically involved but cooperated with one another regarding which parent would be Child's primary caregiver depending on the changing circumstances and demands in each parent's life. Additionally, they coordinated visits on weekends so that both parents could spend time with Child. When Father moved to North Carolina, Child lived with Father from May 2016 to October 2016. After that, Child moved back to Albany to live with Mother. Child primarily remained with Mother while Father was in law school. Father transferred to a law school in Syracuse, New York in 2017 so that he was closer to Mother and Child. Mother moved with Child to Brooklyn, New York in November 2018 when she got a new job. After Father graduated from law school, he moved to Bangor, Pennsylvania, which was close to his family. After Father's graduation, the parties agreed to allow Child to stay with Father's mother, Michelle Hutcheson ("Paternal Grandmother"), for the summer of 2019 to attend a local camp. In August 2019, Child began living with Father in Bangor due to Mother's demanding work schedule. Since then, Child has primarily been living with Father during the week and living with Mother on most weekends.

In March of 2020, Child was staying at Paternal Grandmother's house.

While Child was there, all parties agreed on a weekend for Mother to visit Child at Paternal Grandmother's house. Mother's boyfriend at the time, Thomas Pielli, came with Mother to visit Child. They visited with Child on a Saturday and all parties had dinner together at Paternal Grandmother's house. Mother and Mr. Pielli stayed in a hotel Saturday night and returned to visit with Child on Sunday morning. Father and Paternal Grandmother testified that Mother did not inform them that Mr. Pielli would be joining Mother on the trip, and they were uncomfortable with Mr. Pielli's presence at Paternal Grandmother's house. They further stated that Mr. Pielli overconsumed alcohol during dinner. Mother and Mr. Pielli testified that they all had a pleasant dinner and Father commented to Mother about the positive impression he had of Mr. Pielli after they left.

The parties agreed that Mother would return in two weeks to spend time with Child. Father and Paternal Grandmother testified that a few days prior to the planned trip, Mother asked if she and Mr. Pielli could sleep at Paternal Grandmother's house. Paternal Grandmother told Mother that Mother was welcome to stay the night by herself, but she was uncomfortable with allowing Mr. Pielli to stay in her house. Upon hearing this, Mother became extremely upset and accused Father and Paternal Grandmother of keeping her from seeing Child. Although they assured Mother that she was welcome to come see the Child, Mother remained irate. A few days later, local police showed up at Paternal Grandmother's house to conduct a wellness check because

Mother had called them. Mother testified that a few days before the planned trip, Paternal Grandmother called Mother and told her that she should not come for the weekend. Mother became upset that Paternal Grandmother cancelled their plans without reason and called Father to inquire why she did so. Father stated that he did not know and hung up the phone. The next day, Mother received a text message from Father stating that he was filing for custody of Child. Mother tried repeatedly calling Father and Paternal Grandmother, but the calls went straight to voicemail. Because she could not get in touch with Father or Paternal Grandmother, and was unaware of Child's whereabouts, Mother claimed she called the police to conduct a wellness check to ensure that Child was safe. All parties agree that after this incident, their relationship became increasingly strained.

Father filed for custody on April 7, 2020. The court entered a temporary custody order on April 9, 2020, which awarded Father primary physical custody of Child from Monday to Friday and awarded Mother partial physical custody of Child three weekends per month. In the fall of 2020, Child began attending school in Bangor, Pennsylvania. Mother and Father agree that Child is academically gifted and could benefit from an advanced or gifted program at school. When they inquired at Child's current school, they learned that the advanced program is not offered for Child's grade but would be available to Child when she advances to a higher grade. Mother testified that she inquired into a charter school that is near Mother's current residence in New Jersey

that offers an advanced program that starts at first grade.

Mother and Mr. Pielli married in June 2020. Mr. Pielli admitted that he began drinking alcohol excessively during their marriage but hid it from Mother. Mr. Pielli was hospitalized in July 2021 due to serious gastrointestinal issues as a result of his drinking, and he required care for over a month at a vocational rehabilitation facility to recover. Mr. Pielli did not disclose to the medical professionals or anyone in his personal life that he was abusing alcohol at this time. Mr. Pielli was hospitalized again in November 2021. At this point, Mr. Pielli told Mother about his alcohol addiction, and they separated. Mother testified that she initiated divorce proceedings prior to learning about Mr. Pielli's alcohol abuse because she wanted Mr. Pielli to qualify for assistance programs to cover his medical expenses. Mother's income was too high for Mr. Pielli to qualify for these programs if they remained married. When she learned that Mr. Pielli had lied to her and that his medical issues stemmed from alcohol abuse, Mother followed through with the divorce in earnest. Mother and Mr. Pielli's divorce was finalized in February of 2022 and they no longer maintain contact. Father testified that Mr. Pielli was an active part of Child's life while he was married to Mother and Child was upset when she learned that she would no longer see Mr. Pielli.

Mother testified that she has concerns about Father's methods of disciplining Child. Mother stated that Father often yells at Child and hits her on occasion. Mother noted one occasion where Father yanked Child's arm so

hard that it left a bruise. Mother reported her concerns to Children and Youth Services ("CYS") and an investigation was initiated against Father. Mother testified about another occasion when she went to pick up Child, where Father became upset about things that Child wrote in her journal and threw it down the stairs. Father was yelling at Mother and throwing items down the stairs while Child was present and visibly upset. Father then ordered Mother to leave his house. Mother stated that she was scared by Father's aggressive behavior in front of Child and reported the incident to Bangor police.

Father testified that both the CYS investigation and the police report happened immediately preceding his admittance to the New Jersey Bar. When he received notice of the open investigations, Father self-reported it to the New Jersey Board of Bar examiners. As a result, Father had still not been admitted into the New Jersey Bar at the time of the custody hearing. Father testified CYS ultimately determined that the report was unfounded. Additionally, no charges have been filed against Father as a result of the police report. Father further testified that James Baron, Mother's close friend from law school, left a review on Google for the law firm which currently employs Father. The review mentioned Father by name and stated that he was an unlicensed attorney who was working on clients' cases. Mr. Baron also left a one-star review of Father's attorney's firm even though the firm has not represented Mr. Baron in any capacity. Mother testified that she was unaware that Mr. Baron took these actions and did not ask him to do so.

On May 7, 2020, the parties were ordered to begin seeing Dr. Ronald Esteve for co-parenting counseling sessions. Dr. Esteve testified that he had approximately 38 sessions with the parties. One issue that they regularly discussed was Mother's interest in placing Child in individual therapy. Father was initially resistant to the idea but became more open to the idea towards their later sessions. Mother also expressed interest in conducting a custody evaluation. Dr. Esteve explained that he was not conducting a custody evaluation for litigation purposes but was building a therapeutic relationship with the parties in the hopes of helping them resolve their differences to co-parent Child without further court intervention.

On January 4, 2021, Mother filed a petition seeking a court ordered custody evaluation. After conducting a hearing, at which Dr. Esteve and a psychologist of Mother's choosing testified, the Honorable Paula Roscioli of the Northampton County Court of Common Pleas denied Mother's petition on February 22, 2021. In the same order, the court instructed the parties to arrange for Child to meet with Dr. Esteve so that he could gain insight into Child's outlook on the present custodial arrangement and author a report for the court. Additionally, the court ordered the parties to make arrangements for Child to engage in confidential counseling sessions with another provider and share the costs of the counseling equally. On March 31, 2021, Judge Roscioli and the entire bench of Northampton County recused themselves from this matter to avoid any actual or appearance of a conflict of interest due to

the fact that Father's aunt is a judicial secretary to one of the county's sitting judges.

In April 2021, Dr. Esteve terminated his therapeutic relationship with the parties because Mother accused him of having unprofessional and unethical *ex parte* communication with Father's attorney and took issue with Dr. Esteve's fees for testifying in court. Dr. Esteve determined that he could not continue counseling the parties because it was clear that Mother did not believe him when he denied her allegations. On April 16, 2021, Mother filed a petition for contempt, claiming that Father did not enroll Child in individual counseling in a timely manner. Father testified that Child began individual counseling, but the counselor left the practice shortly thereafter. Mother and Father had a disagreement about whether Child should continue counseling virtually with the same counselor or continue with a different counselor in person. Father further testified that Mother did not pay her half of the costs for the counseling sessions that took place. Mother testified that she did not believe that Father took Child to the counseling sessions due to a letter she received assessing costs for unattended sessions.

The custody matter and the contempt issue were assigned to a visiting judge, the Honorable Emanuel Bertin. Following a custody trial consisting of ten days of testimony, spanning several months, Judge Bertin issued a custody order on August 12, 2022, awarding Father shared legal custody and primary physical custody and awarding Mother shared legal custody and

partial physical custody on alternating weekends and eight weeks in the summer. On Monday, September 12, 2022, Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal.

Mother raises the following issues for our review:

Did the trial court abuse its discretion, thereby depriving Mother of a full and fair custody proceeding, by acting as an advocate for Father during the hearings, including engaging in extensive questioning of witnesses and providing ongoing and biased commentary pertaining to the evidence and witnesses and other critical matters as the custody hearings progressed?

Did the trial court err in refusing to order a Child Custody Evaluation by a qualified mental health professional, which, under the antagonistic relationship present between the parents would have been in the best interests of the Child for there to have been a fully objective custody determination based on a complete record, including but not limited to psychological testing, rather than on the subjective and idiosyncratic views of the trial court, as evidenced by the trial court's conduct during the extended hearings ordered?

Should the Custody Order be vacated, this case be remanded, back to the trial court with directions to order a Child Custody Evaluation and, ultimately, to hold a new trial *de novo* on the issue of custody?

Did the trial court err by failing to include a specific and detailed schedule for the Jewish holidays which Mother and the Child observe, especially when contrasted with the more particular schedule for Christian holidays which the trial court provided for Father's benefit?

Did the trial court err by failing to rule on Mother's petition for contempt with respect to Father's failure/refusal to obtain a counselor for the Child?

(Mother's Brief at 8-9).

In reviewing a child custody order:

> [O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation

omitted).

> With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa.

710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650

(Pa.Super. 2011)).

In her first issue, Mother argues that the trial judge engaged in improper

and extensive questioning of the witnesses during Father's case-in-chief and

acted as co-counsel for Father. Mother asserts that the court intervened

during Father's direct testimony, asking leading questions and inviting Father

to speculate about Mother's background. Mother further argues that the court's extensive questioning during Father's case-in-chief truncated Mother's ability to present her case-in-chief. Mother contends that the court also asked inappropriate questions about her sexual history with an individual who she dated prior to meeting Father, with Father, and Mr. Peilli. Further, Mother alleges that the court made personal and judgmental commentary throughout the case, indicating prejudgment and bias. Mother concludes that the court's conduct throughout the case demonstrates bias and prejudgment such that the trial did not adequately evaluate Child's best interests, and this Court should vacate the custody order and remand for a new trial. We disagree.

Preliminarily, we observe that although Mother alleges that the court's prejudicial and biased questioning and commentary began on the first day of testimony, Mother did not at any point prior to entry of the custody order request that the trial court recuse itself. Accordingly, Mother has waived this claim. **See Lomas v. Kravitz**, 642 Pa. 181, 192-93, 170 A.3d 380, 387 (2017) (stating: "party must seek recusal of a jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived"); **Reilly by Reilly v. Southeastern Pa. Transp. Auth.**, 507 Pa. 204, 220, 489 A.2d 1291, 1299 (1985) (stating: "When circumstances arise during the course of a trial raising questions of a trial judge's bias or impartiality, it is still the duty of the party,

who asserts that a judge should be disqualified, to allege by petition the bias, prejudice or unfairness necessitating recusal").

Even if Mother had properly preserved the issue by filing a timely recusal motion, Mother's issue would merit no relief. This Court has previously held that due to the paramount importance of determining the best interests of the child in a custody matter, "a trial judge has the right if not the duty to interrogate witnesses in order to clarify a disputed issue or vague evidence." **Jordan v. Jackson**, 876 A.2d 443, 453 (Pa.Super. 2005) (internal citation omitted). "Unless the complaining party can establish the judge's questioning constituted an abuse of discretion, resulting in discernible prejudice, capricious disbelief, or prejudgment, a new trial will not be granted." **Id.** at 454.

Additionally:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible[.] Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-

- 12 -

> tempered judge's ordinary efforts at courtroom administration—remain immune.

***Commonwealth v. Kearney***, 92 A.3d 51, 61 (Pa.Super. 2014).

Here, the trial court did ask many questions during Father's direct testimony. However, Father was the first witness to testify in this case and the court's questions were aimed to gain a basic understanding of Mother and Father's backgrounds and history with Child, much of which was uncontested by Mother. The court inquired into the parties' educational and work history, the history of their relationship, the details of when and where Child resided with each parent and the extent to which each parent was involved in Child's care prior to the custody filing. The court did not invite Father to speculate about Mother's background but merely to testify to the details of her background of which he was aware.

Additionally, the court did not limit its questioning to Father's case-in-chief but asked questions of nearly all the witnesses. Again, the questions were not aimed to advance Father's case but largely for the purpose of gaining background information about the witness or to clarify a point of confusion for the court. Regarding questions about Mother's sexual history, the court's questions were for the purpose of understanding the nature and/or seriousness of Mother's relationship with individuals who were relevant to the custody case. The individual who Mother dated prior to meeting Father that the court inquired about was Mr. Baron. The court had reason to inquire into the nature of Mother's relationship with Mr. Baron based on the evidence that

Mr. Baron left negative reviews about Father online. As to the court's questions about Mother's relationships with Father and Mr. Pielli, the court asked questions to understand and clarify the timeline and nature of Mother's relationship with these individuals at various points in her life. Upon our review of the record, we see no indication that Mother's case-in-chief was truncated due to the court's actions. The court allowed Mother much latitude in cross-examining Father's witnesses and did not restrict Mother from presenting any witnesses. Although the extent of the trial court's questioning in this case may have been more than typical, we conclude that the court's inquiries were largely to gain a good understanding of the parties involved in Child's life in order to fashion a custody order that would be in Child's best interest. *See Jordan, supra*.

Regarding Mother's claims of improper commentary by the court, we acknowledge that there were multiple instances during the pendency of the trial where the judge recited the evidence as it had been presented to him by Father, prior to hearing Mother's testimony. However, we note that the judge's actions must be taken in the context of the fact that this custody trial consisted of ten days of testimony spanning several months. There were multiple instances where the examination of one witness was interrupted to permit the testimony of another witness to accommodate witness availabilities. There were also several instances where the examination of a witness began on one date and concluded on another date several weeks later.

Thus, the record demonstrates that the judge's recitation of the facts as it had been presented to date was often for the purpose of discerning whether the topic had already been testified to by the witness at a prior occasion or to limit the scope of cross-examination to the contents of the witness' direct testimony.

Further, the court allowed Mother the full opportunity to testify and present evidence about any topic where she disagreed with Father's or Father's witnesses' testimony. In fact, it is clear from the court's questions seeking clarification during Mother's testimony that the court carefully considered Mother's testimony prior to making its custody determination. Many issues in this case required a credibility determination, which is an area fully within the sound discretion of the trial court as the factfinder. *See S.J.S., supra*. The fact that the court ultimately did not find Mother to be credible and made comments to that effect does not demonstrate bias against Mother or an abuse of discretion. *See Kearney, supra*; *Jordan, supra*. Therefore, Mother's first issue on appeal is waived and would merit no relief in any event.

In her second and third issues combined, Mother contends that due to the adversarial nature of the relationship between Mother and Father, a custody evaluation by a licensed and experienced mental health professional was necessary to ensure that the court was fully informed prior to making its decision. Mother avers that a custody evaluation was necessary to create a full and complete record that focuses on the best interests of Child. Mother

asserts that a child custody evaluation "would have placed objective bounds on the presiding judge, whose idiosyncratic questioning and personal and judgmental comments from the bench cast significant doubt on whether an unbiased evaluation of the facts was undertaken." (Mother's Brief at 32). Mother argues that a custody evaluation would have "flushed out" the material facts and disputes underlying the proceedings and made the trial court's determinations more objectively reliable. Mother concludes that the lack of a custody evaluation renders the court's analysis of the custody factors unreliable, and this Court should vacate the custody order and remand for a new trial after the preparation of a custody evaluation. We disagree.

In a custody matter, "the court may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts … upon the court's own motion, upon the motion of a party with reasonable notice to the person to be examined, or by agreement of the parties." Pa.R.C.P. 1915.8(a). "[A] court is not mandated to order a full custody evaluation but may do so at its discretion." *T.M. v. H.M.*, 210 A.3d 283, 289 (Pa.Super. 2019) (holding that trial court did not abuse its discretion by declining to order custody evaluation where trial court concluded that custody evaluation was not necessary in light of information elicited at full custody trial).

Instantly, Judge Roscioli explained the decision to deny Mother's petition for a custody evaluation as follows:

> [O]ur reason for denying [Mother]'s petition was our conclusion that the appointment of a mental health professional to interview the child and opine as to an appropriate custody arrangement was not warranted under the circumstances of this case. On March 30, 2021, we received testimony from Dr. Roy Lubit, the evaluator proposed by [Mother]. After hearing the testimony of Dr. Lubit, the court was not convinced that an evaluation of the nature proposed was necessary or in the best interests of the child. Dr. Lubit proposed to interview the parents and the child, and to observe the child over the course of one to two months, after which he would opine as to which parent should be the primary custodian. Hearing the testimony of the parents and the child and making a determination as to what custody order should be entered in the best interest of the child is fully within the purview of the court, and the court is tasked with making such a determination in custody cases. No unique circumstances were presented that caused the court to believe that putting the child through an intense evaluation in addition to litigation would be necessary or in her best interest.

(Trial Court Opinion, filed 9/21/22, at 2-3).

We agree with the trial court that there were no unique circumstances in this case such that a custody evaluation was required. In support of her argument, Mother cites **Johns v. Cioci**, 865 A.2d 931, 944 (Pa.Super. 2004), where this Court concluded that the trial court did not have sufficient information to award custody without a custody evaluation. That is simply not the case here. The court held many days of evidentiary hearings, heard testimony from nearly every significant adult in Child's life, and conducted an interview of Child. The court elicited extensive testimony about Mother and Father's childhood, family background, educational background, employment history, and current circumstances. The court further heard testimony about

Child's education, hobbies, friendships, accommodations at each parent's residence, relationships with family members, and the status of Child's physical and mental health. The court also had the benefit of Dr. Esteve's report and testimony summarizing his interactions with Child and the parents during the pendency of this custody matter.

Mother does not specify what information the court lacked in making its determination that a custody evaluation would have remedied. Rather, Mother essentially seems to suggest that a custody evaluation was required to supply a second opinion as to the credibility determinations in this case. There is no basis for this assertion as the trial court is the ultimate arbiter of credibility in a custody matter, and a custody evaluation exists only for the purpose of helping the court make such determinations, if needed. ***See S.J.S., supra***; Pa.R.C.P. 1915.8(a). The court determined that a custody evaluation was neither required nor in Child's best interests in this matter and we discern no abuse of discretion in the court's decision. ***See T.M., supra***.

In her fourth issue, Mother argues that the current custody order is not specific enough about custody of Child during major Jewish holidays. Mother argues that by failing to specify the names and dates of the Jewish holiday for which Mother is entitled to custody of Child, the current custody order "virtually guarantee[s] future controversy." (Mother's Brief at 22). Mother concludes that the trial court erred by failing to delineate dates for major Jewish holidays and this Court should remand with instructions for the court

to cure the ambiguity with a clarifying or supplemental custody order. We disagree.

Here, the custody order states that holidays shall be shared as the parties may agree. It further delineates a schedule for custody of Child during major holidays to be observed in the event that the parties cannot agree. By order of September 20, 2022, the court amended the custody schedule to add that Mother shall have custody of Child in New Jersey for all major Jewish holidays. Mother takes issue with the fact that the custody schedule does not specifically delineate the days of custody for the Jewish holidays in anticipation that the parties will have disagreements as to the dates when such holidays are observed. However, there is no evidence to substantiate Mother's concerns. Father has historically been supportive of Child's exposure to Jewish customs and religious practices. There is no evidence of record to demonstrate that Father has prevented or attempted to prevent Child from participating in her Jewish heritage. If such an issue is to arise in the future, Mother is free to petition the court for further instructions. Accordingly, we do not find that the court erred or abused its discretion in failing to specify dates of custody for Jewish holidays. *See S.J.S., supra*.

In her final issue, Mother argues that the court erred by declining to hold Father in contempt for failing to comply with the order entered on February 22, 2021, which directed the parties to obtain an individual counselor for Child. Mother avers that Father failed to enlist Child in individual

counseling and falsely charged Mother for counseling fees. Mother concludes that the court erred in failing to hold Father in contempt and this Court should remand the matter with instructions to enter a contempt order. We disagree.

When we review a trial court's finding of contempt:

> [W]e are limited to determining whether the trial court committed a clear abuse of discretion. This Court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt. This [C]ourt also has stated that each court is the exclusive judge of contempts against its process.

*G.A. v. D.L.*, 72 A.3d 264, 269 (Pa.Super. 2013) (internal citations and quotation marks omitted).

Instantly, the court explained that a contempt order was unwarranted given the conflicting testimony from both parties about Child's individual counseling. Father maintained that he took Child to the counselor that the parties agreed upon and only stopped when the counselor left the practice. Father also stated that Mother did not pay her half of the counseling fees as required by the same February 22, 2021 order which instructed the parties to share the costs of the counseling. Conversely, Mother testified that she did not pay Father the money because she believed that he charged her for counseling sessions that Child did not attend. Father maintained that any notice Mother received about unpaid fees was due to a clerical error. Given the confusion and conflicting reports surrounding this situation, we see no abuse of discretion in the court's decision not to hold Father in contempt on this ground. *See G.A., supra*. Accordingly, we find no merit to any of

Mother's issues on appeal and affirm the trial court's custody order.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/2023