J-A12038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| HEATHER SHARPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES P. SHARPLES | : | |
| | : | |
| Appellant | : | No. 2894 EDA 2022 |

Appeal from the Order Entered October 20, 2022
In the Court of Common Pleas of Chester County Civil Division at No(s):
2018-01294-CU

| HEATHER SHARPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES P. SHARPLES | : | |
| | : | |
| | : | No. 3028 EDA 2022 |
| APPEAL OF: DIANE REESER AND | : | |
| DOUGLAS REESER | : | |

Appeal from the Order Entered October 20, 2022
In the Court of Common Pleas of Chester County Civil Division at No(s):
2018-01294-CU

BEFORE: OLSON, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED AUGUST 1, 2023**

James P. Sharples ("Father") and Diane and Douglas Reeser ("Grandparents") appeal from the modified custody order entered on October 20, 2022, following a three-day trial. We affirm in part and reverse in part.

Father and Heather Sharples ("Mother") have one daughter ("Child"), who was born in 2008. Mother filed a complaint for custody in 2018, which

resulted in a stipulated custody order giving the parents equally shared legal and physical custody of Child. Grandparents, who are Father's parents,[1] petitioned to intervene. The court granted them standing and, in October 2019, granted them physical custody of Child twice a year. The parties entered another stipulated custody agreement in March 2020,[2] which modified Grandparents' custodial time to one week in the summer and one long weekend in the winter, to be exercised during Father's custodial time. The order provided that if Grandparents chose to exercise their summer week during one of Mother's custodial weeks, Father would have to cede custody to Mother during the preceding week.

Father filed an emergency petition for a custody evaluation in February 2021, citing concerns about both Mother's and Child's mental health. Following an evidentiary hearing, the court ordered a custody evaluation and psychological assessment of all parties by a forensic psychologist, Dr. Dawn Sheehan. Father thereafter filed an emergency petition for primary custody. After more conciliation conferences, the court entered a September 2021 temporary custody order, followed by an October 2021 modified custody order. The court granted Father primary physical custody and reduced Mother's award to partial physical custody for three hours every Tuesday evening and for the duration of alternating weekends. The order specified that

---

[1] Paternal Grandfather is Father's stepfather. **See** Pa.R.A.P. 1925(a) Opinion ("1925(a) Op."), 1/9/23, at 2 n.1.

[2] The court adopted the stipulation as an order in April 2020.

"[d]uring Mother's overnights, Child shall have her phone and may call someone to assist in leaving the house for the purpose of diffusing the situation when the conflict escalates. Mother shall permit Child to leave." Custody Order, 10/28/21, at ¶ 7(d). The order directed Mother to continue individual therapy and Child to continue therapy with a court-ordered counselor. It further stated family therapy could begin at the recommendation of Mother's therapist. It altered Grandparents' custody slightly, providing that they could choose their week of summer custody. It stated that if they chose a long weekend in the winter during Mother's custody time, Father must provide Mother with makeup time from his schedule within 30 days.

Father and Mother both filed petitions to modify custody in the spring of 2022. The court entered an order in May 2022 stating the October 2021 custody order would remain in effect. It did modify the order to the extent that the new order allowed Child's counselor to choose to expand Child's individual therapy to include one or more family members, rather than allowing for family therapy to commence upon the recommendation of Mother's therapist.[3]

Father demanded a trial, and the court held hearings from September 20 to 22, 2022. It heard the testimony of Mother, Mother's fiancé, Father, and Grandmother, and interviewed Child *in camera*. The court also considered the expert testimony of Dr. Sheehan, the results of the court-ordered custody

---

[3] By separate order, the court also granted a petition Father had filed to enjoin Mother from making disparaging remarks.

evaluation, dated October 2021, and the testimony of Child's court-ordered counselor, Jennifer Krumenacker ("Counselor Krumenacker").

The court issued a modified custody order – the order under appeal – on October 20, 2022.[4] It eliminated Mother's custodial weekends. However, it retained Mother's custody times on Tuesdays evenings from 5 to 8 p.m., and stated Child "shall not be permitted to refuse to attend or terminate Mother's custodial time, nor request early departure or late arrival, without Mother's express consent." Final Order for Custody, 10/20/22, at ¶ 3(i).[5] The court modified Grandparents' custodial time such that, rather than any specific amount or scheduled time, Grandparents could exercise custody "[s]olely during Father's custodial time as may be agreed between Grandparents and Father[.]" *Id.* at ¶ 11(a). Grandparents were not permitted to request custody "during any part of Mother's custodial time." *Id.* at ¶ 11(b).

The court ordered Child to continue individual therapy with Counselor Krumenacker, Mother to continue individual therapy with her own therapist, and Father to begin individual co-parenting therapy. It also directed Mother and Child to participate together in reunification therapy with a different therapist. Paragraph 12 of the order prohibited Father and Grandparents from giving or lending Child any motorized vehicles, electronics, jewelry, or more

---

[4] The order was filed on October 17, 2022, but notice was sent to the parties on October 20, 2022. *See* Pa.R.C.P. 236.

[5] The court also gave Mother custody for a few hours on most holidays, and for 12 hours on Mother's Day.

than $100 of cash or cash equivalents, without Mother's express written consent. It also forbade the parties from disclosing to Child when Mother withheld her consent for any gift. By separate order, the court appointed a Parenting Coordinator for a 12-month term. *See* Pa.R.C.P. 1915.11-1(a).

Father and Grandparents moved for reconsideration, which the court denied. Father and Grandparents each filed a notice of appeal. This Court consolidated the appeals.

Father presents the following issues:

1. Did the Trial Court commit an error as a matter of law or abuse its discretion by inappropriately applying the factors pursuant to 23 Pa.C.S. § 5328(a) contrary [to] the weight of the evidence presented at trial, in particular, factors 2, 4, 7, 8, 9, 10, and 15?

2. Did the Trial Court commit an error as a matter of law or abuse its discretion by disregarding the opinions of Jenny A. Krumenacker (Minor Child's court-mandated treating therapist), Dr. Dawn Sheehan (court-appointed psychologist), and Mother's own testimony all of whom concluded that it would be in the best interest of [Child] to have a break in custody with Mother, particularly after Mother failed to present any contrary expert testimony at trial?

3. Did the Trial Court commit an error as a matter of law or abuse its discretion by disregarding the opinions of Jenny A. Krumenacker and Dr. Dawn Sheehan that reunification therapy or joint/family counseling was not recommended between Minor Child and Mother until both parties made progress with their individual therapy efforts?

4. Did the Trial Court commit an error as a matter of law or abuse its discretion by not allowing Minor Child to adequately express her feelings, thoughts, and concerns regarding her relationship with Mother?

5. Did the Trial Court commit an error as a matter of law or abuse its discretion by removing the provision contained in the October 28, 2021 Order providing [Child] the ability to terminate visitation

- 5 -

with Mother during high-conflict situations, despite expert and witness testimony supporting a continued need for this provision in Minor Child's best interest?

6. Did the Trial Court commit an error as a matter of law or abuse its discretion by assuming facts not of record and, *sua sponte*, implementing spending restrictions (by both item and price) on Father despite no party asking for such relief and no evidence or testimony at trial to justify the same?

7. Did the Trial Court commit an error as a matter of law or abuse its discretion by failing to incorporate adequate provisions regarding Father's ability to vacation or plan extracurricular activities with [Child] pursuant to Paragraphs 3(a)(i) & (ii) of the October 17, 2022 Order?

Father's Br. at 4-5 (suggested answers omitted). Grandparents raise the following issues:

1. Whether the trial court erred as a matter of law and/or abused its discretion by exceeding its adjudicatory authority under Section 5323 of the Pennsylvania Child Custody Act by restricting Grandparents' ability to make gifts or loans to the Child where:

a. The evidence did not support a conclusion that such gifts caused or would cause an ongoing risk of harm to the Child, and the trial court made *no* finding of ongoing risk of harm or need for safety conditions as required by Section 5323(e) of the Child Custody Act.

b. Absent evidence of harm to the Child, the spending restrictions are an extraordinary invasion into the privacy of the Grandparents' home and relationship with the Child.

2. Whether the trial court erred as a matter of law, abused its discretion, and/or violated the Grandparents' right to due process by restricting their right to make gifts or loans to the Child where:

a. Mother did not request such relief from the Court; Grandparents were given no notice that spending restrictions might be imposed on them; and Grandparents had no warning that they needed to offer evidence about financial matters ordinarily irrelevant in child custody cases.

b. The denial of due process resulted in a factual error that the Child's Father and Grandparents indulge her more than Mother; and cause the Child to be too focused on material possessions.

3. Whether the trial court erred as a matter of law and/or abused its discretion by modifying paragraph 5 of the order of October 28, 2021 relating to vacations, without delineating its reasons pursuant to Section 5323(d) of the Child Custody Act, denying the Child the ability to join her Grandparents for an annual seven-day seashore vacation in a rental property, which has been a family tradition for more than a decade.

Grandparents' Br. at 19-21 (answers below omitted). We have reordered the issues raised by both parties in our discussion below, for ease of disposition.

"In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion." *D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa.Super. 2014) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)). We will "accept the factual findings of the trial court that are supported by competent evidence of record[.]" *S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa.Super. 2018). "[W]ith regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K.*, 102 A.3d at 478 (quoting *J.R.M.*, 33 A.3d at 650). We may reverse the court's custody decision only if it "involve[s] an error of law, or [is] unreasonable in light of the sustainable findings of the trial court." *Id.* (quoting *J.R.M.*, 33 A.3d at 650).

A trial court must determine custody based on the best interest of the child. *T.M. v. H.M.*, 210 A.3d 283, 288 (Pa.Super. 2019). A non-exhaustive

list of 16 factors for the court to consider when making a custody decision is statutorily prescribed:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). The court has discretion to determine the relative weight to give each factor. **T.M.**, 210 A.3d at 289.

When determining whether to award custody to a grandparent with standing, the court must consider the foregoing factors in conjunction with three additional factors:

(i) the amount of personal contact between the child and the party prior to the filing of the action;

(ii) whether the award interferes with any parent-child relationship; and

(iii) whether the award is in the best interest of the child.

23 Pa.C.S.A. § 5328(c)(1). Grandparents bear the burden of demonstrating that their exercise of custody is in the child's best interest and not to the detriment of the parent-child relationship. **D.R.L. v. K.L.C.**, 216 A.3d 276,

279 (Pa.Super. 2019). There is a presumption that custody will be awarded to a parent over a nonparent, and that presumption may only be rebutted by clear and convincing evidence. 23 Pa.C.S.A. § 5327.

### I. Mother's Partial Custody

Father first argues the court abused its discretion in failing to grant him sole custody after weighing the custody factors, and takes issue with the weight the court assigned to factors 2, 4, 7, 8, 9, 10, and 15. Father argues the court erred in not giving more weight to factor 2 (present and past abuse by a party and continued risk of harm), and factor 4 (need for stability and continuity). Father asserts that Child does not have safety or stability when in Mother's care. He claims Child suffers from skin and eyebrow picking, depression, and anxiety due to conflict when in Mother's custody. He cites a portion of the custody evaluation stating that the Mother-Child relationship is "highly maladaptive and chaotic," and Counselor Krumenacker's testimony that the relationship is "toxic and chaotic." Father's Br. at 13, 15-16 (quoting Comprehensive Custody Evaluation ("Evaluation"), 10/19/21, at 73, and N.T., 9/20/22, at 41).

Father further argues that the court abused its discretion when weighing factor 7, Child's preference. Father asserts that the court should have weighed the Child's preference more heavily, pointing out that the previous trial judge, Dr. Sheehan, and Counselor Krumenacker all described Child as bright, mature, and respectful. *Id.* at 19. Father claims that the court's findings that Child is self-centered, undisciplined, entitled, and overindulged are against the

weight of the evidence. Father relatedly argues the court's questioning of Child *in camera* demonstrated bias against Child and that the court did not foster an environment where Child could express her true feelings and concerns. **Id.** at 37.[6]

According to Father, the court also abused its discretion when weighing factor 8 (one parent's attempts to turn the child against the other parent). Father argues the evidence demonstrated that Father attempted to encourage Child to engage with Mother during her custody periods, whereas Mother made false accusations against him to third parties. **Id.** at 21-23.

Regarding factor 9 (maintaining a loving, stable, consistent and nurturing relationship with the child), Father asserts that the Evaluation shows that Mother does not provide a stable, consistent, and nurturing relationship

---

[6] Father offers the following as examples of the court's inappropriate questioning:

- "You said you don't have any interaction with [Mother] when you are there so how is your relationship stressing you out when you are not interacting with her?"

- "But you sit in your room by choice, correct?"

- "You do have friends in the neighborhood you could go visit, correct?"

- "Would you like to fix the relationship with your mom?"

- "Did you ever try talking to your mom?"

- "Do you report back to your dad about what happens at your mom's house?"

Father's Br. at 38-39 (citations to N.T., 9/22/22, at 53-56 omitted)

with Child. *Id.* at 23. Similarly, regarding factor 10 (meeting daily needs), Father claims that the record supports a conclusion that Mother cannot currently provide for Child's daily needs. He maintains that Dr. Sheehan testified that extended periods of time with Mother produce "adverse childhood experiences" which have long-term negative consequences. *Id.* at 25-26 (quoting Evaluation at 73).

As for factor 15 (parent's mental and physical condition), Father asserts that Mother suffers from anxiety, complex PTSD, substance abuse (cocaine, alcohol, marijuana), and is promiscuous. *Id.* at 26. Father claims Mother testified she does not take her prescribed medications, and that Dr. Sheehan opined that Mother cannot regulate her emotions without her medications and requires further individual therapy before she can address her relationship with Child. *Id.* at 26-27.

More generally, Father argues that the court abused its discretion in not granting him sole custody because he claims Dr. Sheehan and Counselor Krumenacker agreed that a complete break in Mother's custody was warranted. *Id.* at 16-17 (citing R.882a (Evaluation at 78) and N.T., 9/20/22, at 41). He contends that Mother did not present any evidence to contradict their opinions on these points, and the court abused its discretion in disregarding the uncontradicted testimony. *Id.* at 28, 32-33. Father argues the court erred in dismissing Counselor Krumenacker's opinion on the grounds that she is not an expert. Father argues she has a master's degree and a license, possesses knowledge beyond the average lay person, and was

appointed Child's counselor by the court and ordered to remain involved. ***Id.*** at 29-31 (citing Pa.R.E. 702). Father claims Mother even agreed a break was warranted. ***Id.*** at 29 (citing N.T., 9/21/22, at 83-84).

We find Father is due no relief on this issue. First, while Mother testified that she agreed with Counselor Krumenacker's recommendation that some break in custody was warranted, she also stated she believed she and Child were already taking the break during the month preceding trial. Mother stated she did not agree with formally taking away custody indefinitely, which she anticipated would only spur further litigation. N.T., 9/21/22, at 79, 83-84, 142. The court also considered that, because Child had not seen Mother for the month preceding the hearing, Child had already had a "break" in custody. 1925(a) Op. at 3-4, 8.

Next, while Father relies heavily on the expert opinion of Dr. Sheehan, the court explained that it took the Evaluation and Dr. Sheehan's testimony with a grain of salt, considering that the Evaluation "was produced nearly one year ago and is somewhat stale." Memorandum in Support of Custody Order ("Trial Ct. Mem."), 10/20/22, at 2 n.1. The court further found that the Evaluation had "diminished value" in helping it assess the current state of the parties and their relationships because Father had allowed Child to read it, which, the court found, altered and exacerbated the conflict between Child and Mother. ***See id.***; 1925(a) Op. at 6 (citing Father's Pet. to Modify, 3/8/22, at ¶ 7).

Nevertheless, while it did not wholly accept Dr. Sheehan's opinions, the court "agree[d] with Dr. Sheehan's conclusion that the reports of conflict between Mother and [Child], Mother's maladaptive tendencies and the degree of [Child]'s emotional distress should bear significant weight." Trial Ct. Mem. at 12. It acknowledged that "Mother appears to suffer from anxiety, trauma-related symptoms and maladaptive tendencies that negatively impact her insight, judgment, coping skills and parenting skills." *Id.* at 11.

At the same time, the court observed that the negative incidents between Child and Mother described in the Evaluation had not required any intervention by protective services. *Id.* at 4. It also observed that the Evaluation stated Child's behavioral issues are not caused solely by her relationship with Mother, but also by stress due to "peer issues," custody litigation, and Grandparents' intervention in the custody case. *Id.* at 11. It further observed that the Evaluation did not actually recommend a break in Mother's custody. Rather, the court noted, it stated that a partial custody schedule would remain appropriate "so long as Mother engages in appropriate treatment recommendations and Child remains in counseling." 1925(a) Op. at 8-9 (quoting Evaluation at 77).[7] The court noted that Mother is currently participating in individual therapy and was ordered to continue doing so. *Id.* at 9. Father's argument that the court failed to give proper consideration and weight to Dr. Sheehan's expert opinion holds no water.

---

[7] The page of the Evaluation cited by Father does not address a break in custody. *See* R.882a (Evaluation at 78).

- 14 -

In contrast, the court did not find Counselor Krumenacker's testimony to be credible and that it found her to be biased against Mother. Trial Ct. Mem. at 3; 1925(a) Op. at 9 n.6. It recounted two times when Counselor Krumenacker testified that Mother had behaved inappropriately, which contradicted or over embellished Child's testimony. Trial Ct. Mem. at 3-4. It also considered that Counselor Krumenacker tells Child Mother "needs more work," which the court found "perpetuate[s] a negative narrative about Mother." *Id.* at 4; *see also* 1925(a) Op. at 6-7. The court also acknowledged that Father did not offer Counselor Krumenacker as an expert witness. 1925(a) Op. at 9 n.6.

We defer to the court's credibility finding regarding Counsellor Krumenacker and the weight it assigned her testimony. We find no merit to Father's argument that the court committed an error of law when stating that Counselor Krumenacker was not an expert witness, as Father did not offer her as one. *See* N.T., 9/20/22, at 39 (counsel objecting to a question posed to Counselor Krumenacker on grounds that "she's not here as an expert").

In addition to considering Dr. Sheehan's opinion, the court found it would not be in Child's best interests to grant Father sole custody because doing so would place Child "in the echo chamber of Father and Grandparents' disparaging comments regarding Mother." Trial Ct. Mem. at 9. The court was "not convinced that Father's over-indulgence of [Child], coupled with his undermining of her relationship with Mother, is substantially better than the conflict[ed] relationship [Child] has with her Mother." *Id.* While the court did

not specifically mention the evidence Father claims proves that he encourages contact with Mother or that Mother has tried to turn Child against him, the court placed great weight on the fact that Father let Child read the Evaluation[8] and Child's own testimony that Father and Grandparents make negative statements about Mother. *Id.* at 8. It also found that "Father and Grandparents have increased the level of conflict by empowering [Child] to demand to be picked up when she does not get her way with Mother and disparaging Mother." *Id.* at 10.

Regarding Child's preference for custody with Father, the court acknowledged this preference and noted Child's intelligence. *Id.* at 6. However, it also found Child was "self-centered, which is not atypical for a teenager, undisciplined, entitled, and overindulged." *Id.* It considered her preference for staying with Father in light of the fact that Child "generally only needs to ask for something in order to receive it and she is rarely disciplined," which it viewed in contrast with Mother's home, where she must share a bathroom and common living areas. *Id.* It also considered Child's preference for Father in view of Father's allowing her to read the Evaluation, which

---

[8] The Evaluation stated that "no party should discuss any matters related to the legal or evaluative process of this case with the child." 1925(a) Op. at 5 (quoting Evaluation at 78). Dr. Sheehan testified that she was concerned that Father allowed Child to read the Evaluation. *Id.* (quoting N.T., 9/21/22, at 17-18). The court found Father did not testify credibly when he stated he had only allowed Child to read a few sentences of the Evaluation from the computer screen while she looked over his shoulder. *Id.* at 6.

"provided a narrative to avoid the more mundane trappings of Mother's home" and reinforced Father's negative statements about Mother. *Id.* at 7, 8.

The court's findings have a basis in the record, and we defer to the trial court's credibility determinations and the weight it assigned to the various factors. The court considered the evidence on which Father relies. It simply did not give it the weight that Father would have liked. Overall, given the court's sustainable findings, we do not conclude that the court's decision to deny a complete break in Mother's custody and allow Mother to retain three hours of custody a week[9] to be unreasonable or an abuse of discretion.

In addition, we find no merit to Father's argument that the court abused its discretion when conducting the *in camera* interview of Child. While any questioning by an authority may be intimidating to a 14-year old child, the transcript shows that the court asked Child objective, impartial questions about her perceptions of and interactions with both Mother and Father. It also gave Child multiple opportunities to provide supplemental information. *See* N.T., 9/22/22, at 3-57.

Father further argues that the court erred in not including in the custody order any language, such as was included in the October 2021 order, that would give Child the ability to terminate visitation with Mother during high-conflict situations. Father's Br. at 40-42.

---

[9] With additional time on holidays.

We find no merit to this argument. The previous order stated that, "[d]uring Mother's overnights, Child shall have her phone and may call someone to assist in leaving the house for the purpose of diffusing the situation when the conflict escalates. Mother shall permit child to leave." Custody Order, 10/28/21, at ¶ 7(d). However, this language by its terms applies only to overnight visits, and the instant order does not include any overnights with Mother.

Moreover, while the instant order states Child "shall not be permitted to refuse to attend or terminate Mother's custodial time, nor request early departure or late arrival, without Mother's express consent," Final Order for Custody, 10/20/22, at ¶ 3(i), this provision does not expressly address emergency situations. Rather, it serves as a counterbalance to the court's finding that Child regularly uses her ability to terminate visits as leverage and was intended to prevent any further conflict between the parties. *See* 1925(a) Op. at 12 ("The trial court was and remains unwilling to provide Child with a cudgel that can be used whenever it appears that Mother may deny her undivided attention, a request, demand, or threaten discipline. Creating or permitting such a dynamic is not in the best interests of Child"). Importantly, the order provides for Child to contact the non-custodial parent, and vice-versa. *See* Order, 10/20/22, at ¶ 10(a)-(c). The order is not unreasonable or an abuse of discretion.

## II. Reunification Therapy

Father contends that the court abused its discretion in ordering Child and Mother to participate in reunification therapy. According to Father, both Counselor Krumenacker and Dr. Sheehan recommended against joint or family therapy until Mother made more progress in her own therapy and reunification therapy was recommended by the individual therapists. Father's Br. at 33 (citing N.T., 9/20/22, at 38; N.T., 9/21/22, at 12; Evaluation at 78). Father cites Counselor Krumenacker's testimony that reunification therapy will not work until Mother understands why her relationship with Child is not working. *Id.* at 34 (citing N.T., 9/20/22, at 45, 62-63). He also cites a portion of the Evaluation stating Dr. Sheehan's belief that "joint/family counseling would be counterproductive for both Mother and Child." *Id.* (citing Evaluation at 73). Father argues that the court erred in disregarding the expert testimony and cherry-picking a portion of the Evaluation to justify its decision, while simultaneously claiming Dr. Sheehan's opinion in the Evaluation was stale. *Id.* at 35.

In its Rule 1925(a) opinion, the court explained that it ordered reunification therapy because the Evaluation states that Heather Goldner Kinsey, JD, LMFT, who mediated a session between Mother and Child in August 2021, recommended reunification therapy to Dr. Sheehan. 1925(a) Op. at 10 & 10 n.7.; *see also* Evaluation at 56. The court also observed that while Dr. Sheehan was opposed to joint counseling at the time she authored the Evaluation, Dr. Sheehan did not expressly testify she was opposed to

reunification therapy at the time of trial. 1925(a) Op. at 10.[10] The court also considered that Child testified *in camera* that she does not know much about Mother. *Id.* at 10-11 (citing N.T., 9/22/22, at 19).

The decision to require reunification therapy does not involve an error of law and is not unreasonable. There is support in the record for the court's decision to order the therapy, even if does not prove to be immediately effective.

### III. Father's/Grandparents' Vacation Custody

Father argues that by allowing Mother to exercise custody every Tuesday night, the court has interfered with Father's ability to plan a week-long vacation with Child to take place on a calendar week, and in particular, an annual shore vacation with Grandparents. Father's Br. at 51-52.

Grandparents similarly argue that eliminating their dedicated week of custody time is not in Child's best interest and that the court failed to delineate its reasons for doing so. Grandparents' Br. at 84-93. They point out that no party petitioned the court to modify the provisions regarding their exercise of custody. They also claim the court committed an error of law in concluding that Section 5328(a) is not applicable to their request for custody. *Id.* at 89 (quoting 1925(a) Op. at 22).

---

[10] Father cites Dr. Sheehan's testimony that at the time she authored the Evaluation, she recommended Mother "needed pretty intensive therapy to address her issues before she could have a healthy relationship with her daughter[.]" N.T., 9/21/22, at 12. Dr. Sheehan testified she had not received any further information that could put her in the position to alter her previous recommendation. *Id.* at 12-13.

We find Father is due no relief. As the trial court pointed out, Father has custody of Child roughly 98% of the time, which provides him "more than an adequate amount of time to take a vacation." 1925(a) Op. at 4, 14. Indeed, nothing in the custody order prevents Father from taking Child on vacation from Wednesday morning through Tuesday morning. The court did not abuse its discretion.

Regarding Grandparents, the court found that their intervention in the custody matter for purposes of their annual vacation "is a source of stress" for Child. Trial Ct. Mem. at 5, 12; *see also* 1925(a) Op. at 24 (citing N.T., 9/20/22, at 174). The court observed that in the past, Grandparents' requests to exercise custodial time during Mother's time have resulted in conflict. Trial Ct. Mem. at 13. The court recounted that Dr. Sheehan recommended that if Mother's custody remains limited, Grandparents can negotiate their custody time with Father; the court also found that Grandparents "have unfettered access to [Child] during Father's custodial time." *Id.*; 1925(a) Op. at 5 n.5 (citing Evaluation at 78).

Given these findings, which are supported by the record, we see no abuse of discretion in the court's determination that Mother may exercise custody every Tuesday night, at the expense of Grandparents' ideal weekend-to-weekend shore vacation. The court found that Grandparents have unlimited access to Child during the 98% of the time that Father exercises custody, and that scheduling Grandparents' custody as a separate week was an unnecessary source of conflict. Its decision to remove that source of conflict

was not unreasonable. Grandparents can take Child on a nearly week-long vacation, from Tuesday night to the following Tuesday afternoon, or can take a vacation during the calendar week if they return Child to Mother for her visit on Tuesday evening.

The court did err in stating the factors under Section 5328(a) are not relevant when determining Grandparents' custody. Those custody factors are to be considered in conjunction with the factors specific to grandparents under Section 5328(c). *See D.R.L.*, 216 A.3d at 280.

Nonetheless, we do not find the error warrants reversal in this case, as none of the factors of Section 5328(a) would render the court's decision an abuse of discretion. Grandparents have not carried their burden to prove their calendar-week-long exercise of custody is in Child's best interest and not to the detriment of the parent-child relationship, and we therefore affirm the court's decision to relegate their custody time to that which Father shares with them.

## IV. Spending Restrictions

Both Father and Grandparents contest the court's decision to limit their spending on Child, and the court's authority to do so. Father asserts that the court's conclusion that he provides Child with a lavish lifestyle and buys Child's affection is not supported by the record and disregards the evidence of the actual reasons for the poor relationship between Child and Mother, which Father asserts are "Mother's inability to effectively convey . . . love, attention, and affection." Father's Br. at 45.

Father also argues that the spending restriction is impractical and unworkable. *See id.* at 48-50. For example, Father queries whether he can contribute more than $100 per month to Child's education fund without Mother's approval, and what he will tell Child regarding her birthday gifts, for example, as the order prohibits him from disclosing when Mother has withheld consent for a given purchase. He also points out that he would have to involve the court in every purchase to which Mother does not consent, and that Mother does not need to give any reason for withholding consent. Father also stresses that Mother did not request a cap on spending, and that the spending issue was not central to the custody issue.

Grandparents argue the trial court did not have authority to impose a spending restriction because it did not find there was a risk of safety or harm to Child. Grandparents' Br. at 45-46 (citing Section 5323(e)). According to Grandparents, the best-interest standard does not grant the court unlimited power, and due process prohibits the court from micromanaging child-rearing decisions. *Id.* at 48-49 (citing *Troxel v. Granville*, 530 U.S. 57, 58 (2000)). They further contend the court lacked authority to restrict spending *sua sponte*, and quote Mother's testimony that she does not feel the need to compete with Grandparents' spending. *Id.* at 55-56 (quoting N.T., 9/21/22, at 153).

Grandparents also argue the record does not support the trial court's decision. They assert Child does not receive excessive gifts, and that she testified that Father and Grandparents occasionally refuse when she asks for

something. They point out Child did not testify as to how frequently she asks for something, or how extravagant her requests are. Grandparents echo Father's argument that the order is broad and vague, and question whether they can lend Child their car for a trip to the grocery store, and what they would be allowed to tell Child if, for example, Mother did not give consent to buy Child a graphing calculator for school. *Id.* at 65-66.

Grandparents also argue the court's imposition of a spending restriction deprived them of procedural due process. They assert that because no party petitioned the court to intervene on this issue, Grandparents had no notice that it would be decided by the court. They claim that although their spending is mentioned in passing in the 78-page Evaluation, it is not among the "Relevant Findings and Impressions," the custody factors, or the recommendations. *Id.* at 69-70. They argue that parties' spending is typically only evaluated in custody cases where there is poverty, relocation, or attempts to influence a child's testimony – none of which was present here.

They further claim that because they did not know they needed to present evidence on this issue, they had no opportunity to be heard. Grandparents assert that had they had proper notice, they would have presented evidence to rebut the factual conclusions the trial court drew solely from Child's *in camera* testimony, such as the respective sizes of the parties' homes, the cost of the treehouse, which Grandparents claim Grandfather built himself, or the dress Child wore to court, which Grandparents claim was from a sales rack at Macy's and purchased by Father. *Id.* at 73-74. Regarding any

assertions of overindulgence of the Child on their part, Grandparents assert they would have presented rebuttal evidence of their house rules for Child, including chores and discipline.

The trial court found that Grandparents have no substantive due process rights in relation to custody of Child. 1925(a) Op. at 15-16. It found that Grandparents were not deprived of procedural due process because they had notice of the trial and an opportunity to be heard and call witnesses. *Id.* at 16. It stated Grandparents had "notice that their spending on Child may be at issue based on the [Evaluation]." *Id.* at 17.[11]

Factually, the court found "[Child] is very oriented towards the material" and that Grandparents "overindulge [Child] with material benefits," based on Child's *in camera* statements to the court. Trial Ct. Mem. at 5, 6. It recounted,

> At Father's house [Child] enjoys her own bedroom, bathroom, a basement set up as an art studio and a "she shed" in a living-quarters over the garage. She generally only needs to ask for something in order to receive it and she is rarely disciplined. The same is true of Grandparents' home, which is larger than her Father's home and includes a treehouse. Grandparents do not discipline [Child], and she generally need only ask for something to receive it. During her interview with the Court, [Child] made a point of informing the Court that her Grandmother bought her the new dress she was wearing the night before, because she "didn't have anything to wear to court." Mother does not provide this level of material indulgence to [Child].

---

[11] The court also found Grandparents waived their due process claims by failing to make specific allegations to support their due process argument in their Rule 1925(b) statement. However, as Grandparents raised the issue in their motion for reconsideration, and the court addressed its merits in its Rule 1925(a) opinion, we find waiver inappropriate.

*Id.* at 6-7. The court similarly recalled Child's *in camera* statement that she need only ask Father for something to receive it. 1925(a) Op. at 13.

In addition to Child's *in camera* statements, the court made factual findings on this issue, based on the Evaluation and Grandmother's testimony:

- Friends of Grandparents informed Dr. Sheehan "Child is a bit overindulged at times by her grandparents, but that this is not excessive."

- Mother told Dr. Sheehan, "[A]s long as I was spending money, [Child] was fine. As soon as I said no, she rejects, refuses to participate, or take pictures; then she calls [Grandparents] and they attack me."

- Grandmother testified that "maybe, we're Switzerland. We are the ones that say for breakfast if you want a piece of chocolate, that's fine. It's that kind of comfort where she just feels safe always," and told Dr. Sheehan that Child "likes to have undivided attention at times."

- Grandfather told Dr. Sheehan that "we decide what to do in life based on [Child]."

- Dr. Sheehan concluded that Grandfather is preoccupied with Child and that Child sees Grandmother as a mother figure.

*Id.* at 17-19.

From these findings, the court concluded that imposing a spending restriction on Father and Grandparents would be in Child's best interest. It relied on the Pennsylvania Supreme Court's statement in *Colonna v. Colonna*, 855 A.2d 648, 651 n.5 (Pa. 2004), that "the temptation for the well-

off parent to buy the affection of the children, and the tendency of the children to favor the parent who provides them with a more attractive lifestyle are factors that do not serve the best interests of the children." *Id.* at 19.

We find the trial court abused its discretion in restricting Father's and Grandparents' spending. The parties had insufficient notice that the court would be entertaining a cap, and the imposition of a cap was unreasonable.[12]

Due process requires notice and an opportunity to be heard "at a meaningful time in a meaningful manner." *Everett v. Parker*, 889 A.2d 578, 580 (Pa.Super. 2005) (citation omitted). Notice is required to ensure "that each party is provided adequate opportunity to prepare and thereafter properly advocate its position, ultimately exposing all relevant factors from which the finder of fact may make an informed judgment." *Id.* (citation omitted). Where facts are at issue, due process almost always "requires an opportunity to confront and cross-examine witnesses." *E.B. v. D.B.*, 209 A.3d 451, 463 (Pa.Super. 2019) (citation omitted). "[A]bsent adequate notice or opportunity to prepare, neither [this Court] nor the trial court can assume that the parties have either sufficiently exposed the relevant facts or properly argued their significance." *Id.* at 464 (citation omitted).

---

[12] Because we reverse on this basis, we need not address whether the court otherwise had authority, in a custody dispute, to impose spending restrictions on the parties where the child's safety was not at issue.

No one petitioned the court to impose a spending restriction or argued for one at trial. When asked whether she was bothered by Grandparents' expenditures, Mother testified,

> Maybe in the beginning because I felt like I had to compete, but I've accepted that – again, like I said, I can't control them. I can't control what other people have. You know, I'm just going to provide what I can provide. If [Child] can't accept that, that's something that we can work on. But I'm happy with what I have because money doesn't buy love or happiness.

N.T., 9/21/22, at 153. Nor did any witness recommend a spending restriction, and the portions of the Evaluation on which the trial court relies were insufficient to put the parties on notice that the court might impose a spending restriction. *See Everett*, 889 A.2d at 580-82 (finding Mother was deprived due process when court modified custody even though Mother was not served with meaningful notice of the hearing and Father's request for custody was on third page of his contempt petition).

Furthermore, there was inadequate support in the record for the restriction. The only evidence regarding Father's and Grandparents' expenditures came from Child's *in camera* interview. But even her testimony did not address the amount of money Father or Grandparents spend on her. Child was not subject to cross-examination. The record does not support a finding that Child is "spoiled."

Moreover, even if Child's testimony was sufficient to support a conclusion that it would be in Child's best interest if Father and Grandparents spent less money on her, the resolution imposed by the court was not

reasonable. The record resoundingly supports the conclusion that creating conflict between the parties is not in Child's best interest. This was even part of the court's rationale in forbidding Father and Grandparents from attempting to negotiate vacation time with Mother. Yet the court gave Mother exclusive control over Grandparents' and Father's ability to spend more than $100 on Child. This is not a reasonable directive. The likelihood of ensuing conflict is high, and the preexisting conflict will likely be exacerbated by requiring Father and Grandparents to ask Mother's permission for expenditures over $100. For the foregoing reasons, we vacate this portion of the order.

Order vacated as to paragraph 12. Order affirmed in all other respects.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2023